In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2488

GIRL SCOUTS OF MANITOU COUNCIL, INC.,

*Plaintiff-Appellant,*

*v.*

GIRL SCOUTS OF THE UNITED STATES OF AMERICA, INC., *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 08 C 184—**J.P. Stadtmueller**, *Judge.*

ARGUED SEPTEMBER 8, 2008—DECIDED SEPTEMBER 11, 2008[1]
OPINION DECEMBER 15, 2008

Before POSNER, KANNE, and TINDER, *Circuit Judges.*

KANNE, *Circuit Judge.* Girls Scouts of the United States of America (GSUSA) first chartered Girl Scouts of Manitou Council, Inc. as a local Girl Scout council in 1950.

---

[1] With notation that an opinion would follow.

Now, almost sixty years later, GSUSA, acting pursuant to a new organizational strategy, is in the process of merging many of its local councils to form larger regional councils. Manitou has declined to participate in the proposed restructuring, which has prompted GSUSA to undertake proceedings to unilaterally reduce Manitou's chartered territory. Manitou filed suit against GSUSA and sought a preliminary injunction to prevent any changes to its jurisdiction pending final resolution of its claims. The district court denied Manitou's motion for a preliminary injunction, concluding that Manitou would not suffer the requisite irreparable harm, and Manitou appealed. We have found the district court's determination that Manitou would not suffer irreparable harm between now and resolution of its claims to be clearly erroneous. Because Manitou has also satisfied the other requirements for a preliminary injunction, on September 11, 2008, this court issued an order, with an opinion to follow, reversing the district court. The order enjoined GSUSA from making any changes to, or interfering with, Manitou's current jurisdiction. This opinion sets forth the rationale for our order of September 11.

## I. BACKGROUND

In 1912, Juliette Gordon Low founded the Girl Scouts in Savannah, Georgia. Nearly four decades later, in 1950, Congress incorporated the organization as the Girl Scouts of the United States of America. *See* Pub. L. No. 460, 64 Stat. 22 (1950) (codified as amended at 36 U.S.C. § 80301 *et seq.*). Today, as GSUSA approaches its 100th birthday, its

membership stands at approximately 3.7 million and includes satellite organizations in ninety countries.

The stated purposes of GSUSA are "to promote the qualities of truth, loyalty, helpfulness, friendliness, courtesy, purity, kindness, obedience, cheerfulness, thriftiness, and kindred virtues among girls," 36 U.S.C. § 80302(1), and to instill "the highest ideals of character, patriotism, conduct, and attainment," *id.* § 80302(3). Notwithstanding these virtuous aspirations, however, "Girl Scouting" is big business. In Fiscal Year 2006, GSUSA reported operating revenues of nearly $123 million. Of that number, $35 million derived from membership dues,[2] while another $13.5 million came from the sales of Girl Scout merchandise.[3] Notably, these figures do not include direct revenues from sales of the organization's famous cookies, which accrue entirely to the local councils that conduct the sales.[4]

GSUSA is led by the National Council of Girl Scouts, which consists of delegates from its various member

---

[2] Every Girl Scout is required to pay annual membership dues of $10. These dues accrue to GSUSA, not to the local councils. A more complete explanation of the financial relationship between GSUSA and its local councils follows.

[3] GSUSA sells Girl Scout-branded merchandise to the local councils at wholesale, who then resell the products to their members.

[4] Although GSUSA does not receive direct revenues from the sale of Girl Scout cookies, it does receive royalties paid from the bakeries approved and licensed by GSUSA to produce Girl Scout cookies.

organizations. The National Council meets every three years to elect its board of directors (the "National Board") and various corporate officers. The National Board appoints other corporate officers, including the chief executive officer. GSUSA is governed by the *Blue Book of Basic Documents*, a compilation of organizational documents that includes GSUSA's congressional charter, constitution, bylaws, policies, and so forth. GSUSA periodically updates the *Blue Book*; it issued the current version in 2006.

To provide Girl Scouting to the masses, GSUSA has developed an extensive network of local councils. In 2005, GSUSA's organizational structure featured approximately 315 of these councils. Each local council is governed by its own independent board of directors, employs its own officers and professional staff, and is responsible for its own financial health. A local council's primary revenue sources include private donations, sales of Girl Scout cookies, sales of other Girl Scout products and services,[5] and fees and charges from the use of council-owned camps and facilities.

The relationship between GSUSA and a local council is defined by that council's Girl Scout charter. For a nominal fee, GSUSA issues a charter to the local council, which grants to that council "the right to develop, manage, and maintain Girl Scouting throughout the areas of its jurisdiction," including the right to use GSUSA's names

---

[5] In addition to cookies, Girl Scouts sell candy, nuts, calendars, and magazine subscriptions, as well as Girl Scout-licensed apparel and equipment.

and protected marks. In the charter application, which the charter incorporates by its terms, the local council agrees "to operate as a council in accordance with and to be limited by policies so identified, published, and distributed to councils by Girl Scouts of the United States of America, accepting them as binding on the Council, on all its members, officers, employees, and those affiliating with it." Each charter designates the council's jurisdiction and remains valid for a stated length of time.

*A. Girl Scouts of Manitou Council, Inc.*

The plaintiff in this case, Girl Scouts of Manitou Council, Inc., a Wisconsin nonprofit corporation, is one of GSUSA's local councils. Manitou's headquarters are in Sheboygan, Wisconsin. Its current jurisdiction consists of all or part of seven counties located in eastern Wisconsin,[6] and its membership exceeds 7,000 individuals. GSUSA originally chartered Manitou in 1950 and has routinely renewed its charter, with the most recent renewal taking effect on January 1, 2006. The present charter is to run for "up to four years."

Manitou, like GSUSA, is no small organization. It is managed by an independent board of directors and employs a full-time staff of seventeen people. It owns significant real property, including two large Girl Scout

---

[6] Manitou's jurisdiction extends into all or part of the Wisconsin counties of Calumet, Dodge, Fond du Lac, Manitowoc, Ozaukee, Sheboygan, and Washington.

camps and a corporate office building. The first camp, Camp Evelyn, is a 240-acre development in Plymouth, Wisconsin, that includes more than forty buildings and features an Olympic-sized swimming pool. The second camp, Camp Manitou, covers 140 acres near Two Rivers, Wisconsin. Manitou states that the two properties have a combined fair market value of more than $12 million. The corporate headquarters, which include administrative offices and meeting and activity rooms, are located in Sheboygan and have a fair market value in excess of $3 million.

Manitou asserts that nearly 100% of its annual revenues derive from the sale of Girl Scout merchandise and services, private donations, and investment income from Manitou's reserve funds. Girl Scout cookie sales alone generate more than $1 million in revenue each year. Manitou states that less than 0.2% of its revenues come from renting its facilities to third parties unaffiliated with the Girl Scouts.

## B. GSUSA's National Realignment Strategy

In 2004, in response to what it cites as declining membership, fading brand image, and "waning program effectiveness," GSUSA commenced a thorough evaluation of its organization to determine how, moving forward, it could remain both viable and relevant. GSUSA, aided by a consultant from Columbia University, concluded that a "fundamental transformation" was necessary. In a strategy introduced in the summer of 2005, GSUSA announced a plan to reduce, by the end of 2009, the number

of local councils from approximately 315 to 109, merging the local organizations to form larger, "high capacity" councils. These larger councils, according to GSUSA, would no longer compete for top local sponsors and media attention, would have the resources to hire professionally trained staff members, and would be positioned to take advantage of economies of scale in programming, training, fund-raising, and branding. GSUSA's realignment plan was nationwide in scope and involved virtually every council, regardless of size or past performance.

The National Board approved the realignment plan in September 2005. That winter, CEOs and chairs of the boards from the various local councils met in Orlando to discuss the realignment process. From that meeting, in which Manitou's representatives actively participated, came the initial realignment strategy for Wisconsin. The final proposal (the "Wisconsin Realignment Plan"), formally submitted by Denise Schemenauer, Manitou's CEO, on behalf of the affected councils in May 2006, would have reduced the fifteen local councils located in Wisconsin and the Upper Peninsula of Michigan to three. Manitou would have merged 60% of its territory with the territories of six other councils in northern Wisconsin and the Upper Peninsula[7] to form a new council, the Girl

---

[7] The other six councils involved in the proposed realignment were the Girl Scouts of the Fox River Area, Inc.; Girl Scouts of the Peninsula Waters, Inc.; Girl Scouts of Lac-Bale Council, Inc.; Girl Scouts of Woodland Council, Inc.; Girl Scouts of Birch Trails Council WI, Inc.; and Girl Scouts of Indian Waters Council, Inc.

(continued...)

Scouts of Northwestern Great Lakes. The remainder of Manitou's territory would have been divided between the other two new Wisconsin councils, which were to be situated to Manitou's south and southwest. The National Board approved the Wisconsin Realignment Plan in August 2006.

Not long thereafter, Manitou's leadership began having second thoughts about the proposed realignment. Between May and October 2007, while continuing to avow its intentions to follow through with the merger, Manitou proposed three separate amendments to the Wisconsin Realignment Plan. GSUSA's leadership rejected each in turn, choosing instead to reaffirm its support for the Wisconsin Realignment Plan. In a letter to the chair of Manitou's Board, Liesl Rice, dated October 3, 2007, GSUSA denied Manitou's third such proposal and stated that "[w]e will not again reconsider the jurisdictional boundaries, as approved by the National Board on August 24, 2006." The letter concluded by directing Manitou's leadership to sign the written agreements necessary for the merger to proceed. If Manitou failed to do so, warned GSUSA, "the National Board will take all necessary and further action in accordance with the Blue Book of Basic Documents 2006."

---

[7] (...continued)
Notwithstanding Manitou's refusal to participate, these councils have continued with merger plans and now operate as a single council located in northern Wisconsin and the Upper Peninsula of Michigan.

In three separate communications dated January 9, 2008, Manitou and its legal counsel informed GSUSA leadership that Manitou's board of directors had concluded "that a merger with the other Councils currently suggested by [GSUSA] is not in the best interest of Manitou Council and its members." Faced with Manitou's resistance to the realignment merger, GSUSA initiated procedures later that same month to unilaterally remove more than half of Manitou's jurisdiction. These procedures had been outlined for the first time in the *Blue Book of Basic Documents 2006*, which contained a new section establishing steps to change a council's jurisdiction under a variety of circumstances, including when involved councils were unable to reach a merger agreement. *See* Girl Scouts of the U.S. of Am., *Blue Book of Basic Documents 2006*, at 28-29 (2006) [hereinafter *Blue Book*]. After several delays, GSUSA established June 15, 2008, as the date on which the National Board would make a final decision regarding Manitou's jurisdiction.

### C. Procedural History

On February 29, 2008, Manitou filed a diversity action against GSUSA in the United States District Court for the Eastern District of Wisconsin, seeking equitable relief on a variety of grounds, including violation of the Wisconsin Fair Dealership Law, breach of contract, tortious interference, economic coercion, and conspiracy. Manitou sought to have the court permanently enjoin GSUSA from altering Manitou's existing jurisdiction. The same day, Manitou also filed a motion requesting a preliminary

injunction against GSUSA. The district court, without conducting an evidentiary hearing, denied this motion in an order dated June 5, 2008. The district court rested its decision on a single finding: that Manitou had failed to meet its threshold burden of demonstrating that it would suffer irreparable harm in the absence of a preliminary injunction. It is this order that Manitou appealed. After hearing oral arguments from the parties, this court issued an order on September 11, 2008, in which we reversed the district court and enjoined GSUSA "from making any changes to, or interfering with, the current council jurisdiction of appellant Girl Scouts of Manitou Council, Inc., pending final resolution on the merits in the district court."

## II. ANALYSIS

An equitable, interlocutory form of relief, " 'a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.' " *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (quoting *Warner Bros. Pictures, Inc. v. Gittone*, 110 F.2d 292, 293 (3d Cir. 1940) (per curiam)). To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase.

To survive the threshold phase, a party seeking a preliminary injunction must satisfy three requirements. *See Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001); *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986). First, that absent a preliminary injunction, it

will suffer irreparable harm in the interim period prior to final resolution of its claims. *Ty*, 237 F.3d at 895. Second, that traditional legal remedies would be inadequate. *Id.* And third, that its claim has some likelihood of succeeding on the merits. *Id.* If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If, however, the court finds that the moving party has passed this initial threshold, it then proceeds to the balancing phase of the analysis. *Id.*

In this second phase, the court, in an attempt to minimize the cost of potential error, *see Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 593-94 (7th Cir. 1986), "must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest,'" *Lawson Prods.*, 782 F.2d at 1433. Specifically, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief. *Abbott Labs.*, 971 F.2d at 11-12. In so doing, the court employs a sliding scale approach: "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Mach.*, 749 F.2d at 387; *see also Ty*, 237 F.3d at 895; *Abbott Labs.*, 971 F.2d at 12. Where appropriate, this balancing process should also encompass any effects that granting or denying the

preliminary injunction would have on nonparties (something courts have termed the "public interest"). *Ty*, 237 F.3d at 895; *Roland Mach.*, 749 F.2d at 388. Taking into account all these considerations, the district court must exercise its discretion "to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Lawson Prods.*, 782 F.2d at 1436.

We review a district court's decision to grant or deny a preliminary injunction for an abuse of discretion. *Id.* at 1437. A district court abuses its discretion when, in conducting its preliminary injunction analysis, it commits a clear error of fact or an error of law. *Ty*, 237 F.3d at 896; *Abbott Labs.*, 971 F.2d at 13; *see also Lawson Prods.*, 782 F.2d at 1437 ("Clearly, a factual or legal error may alone be sufficient to establish that the court 'abused its discretion' in making its final determination."). A district court's finding of fact is clearly erroneous when "'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). The question is "whether the judge exceeded the bounds of permissible choice in the circumstances." *Roland Mach.*, 749 F.2d at 390. Absent such errors, we accord a district court's decisions during the balancing phase of the analysis great deference. *Abbott Labs.*, 971 F.2d at 13.

Where, as here, a district court decides that a party moving for a preliminary injunction has not satisfied one of the threshold requirements, we have encouraged the

court to conduct at least a cursory examination of all the aforementioned preliminary injunction considerations. *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 730 (7th Cir. 1998); *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1121 (7th Cir. 1997). Doing so expedites our review and helps to protect the interests of the parties. *Platinum Home Mortgage*, 149 F.3d at 730; *Meridian Mut. Ins.*, 128 F.3d at 1121. If the district court declines to do so and chooses instead to rest its entire decision on one factual finding—here, the absence of irreparable harm—we review that finding of fact, as we do any finding of fact, for clear error. *See Stewart v. Taylor*, 104 F.3d 965, 970 (7th Cir. 1997); *Meridian Mut. Ins.*, 128 F.3d at 1114. Should we determine the district court's factual finding to be erroneous, we then may complete the preliminary injunction analysis if the record contains information sufficient for us to assess the remaining factors. *See, e.g., Meridian Mut. Ins.*, 128 F.3d at 1120.

In the present case, the district court never reached the balancing phase of the preliminary injunction analysis; instead, it ceased its analysis and denied Manitou's motion once it determined that Manitou had failed to demonstrate that it would suffer irreparable harm without the preliminary injunction. We begin our analysis with that finding.

### A. Irreparable Harm

In its order denying Manitou's motion for a preliminary injunction, the district court concluded that

Manitou had not demonstrated that it would suffer irreparable harm without injunctive relief. The court based this finding on four grounds. First, because GSUSA had not reached a final decision regarding Manitou's future jurisdiction at the time of the court's order, the court found that any alleged harm to be suffered by Manitou as a result of GSUSA's realignment strategy was mere speculation. The court noted that as a result of GSUSA's review process, "the realignment may not even occur." Second, the district court found that Manitou "has not demonstrated that it would lose any assets, employees, or the ability to provide Girl Scouting." Third, the court determined that should a final judgment on the merits be in Manitou's favor, it simply could have its jurisdiction restored. These three grounds we shall refer to as "merits-based," because they involve the question of whether Manitou will *actually suffer* irreparable harm.

As a fourth ground for its decision, the district court found unavailing Manitou's attempts to seek protection as a "dealer" under the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stat. § 135 *et seq*. The WFDL protects dealers from grantors who wish to "terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause." *Id.* § 135.03. Importantly for present purposes, the WFDL also provides for a presumption of irreparable harm when its terms are violated. *Id.* § 135.065. Here, the court refused to "improperly expand" the definition of a "dealer" under the WFDL to include Manitou, a nonprofit corporation. Because the court concluded Manitou was not a dealer, it was not entitled to the statutory presumption of irreparable harm.

We first address the court's merits-based conclusions that any harm was speculative, that Manitou would suffer no harm, and that any harm Manitou might suffer would be rectifiable following trial, i.e., not irreparable. We then proceed to the court's statutory conclusions regarding Manitou's arguments for protection under the WFDL.

### 1. The District Court's Merits-Based Findings

The district court concluded that any injuries suffered by Manitou were speculative because the National Board had not yet formally required Manitou to cede portions of its jurisdiction. On June 15, 2008, ten days after the district court entered its order, the National Board mandated that Manitou deliver, no later than September 15, 2008, 60% of its jurisdiction to the six councils with which it was to merge originally, which have since successfully merged into one large council. Thus, it is clear that any harm Manitou might suffer, the existence of which we discuss below, is no longer mere speculation.

Next, the district court found that Manitou did not demonstrate that the changed jurisdiction would result in a loss of its assets, the termination of any of its employees, or an impairment on its ability to provide Girl Scouting. The facts in the record, however, tell a different story. By removing the majority of Manitou's jurisdiction, GSUSA is reducing Manitou's ability to generate revenues—revenues that Manitou needs to cover its annual budget, which is largely fixed and was established based on Manitou's existing membership levels.

Manitou, like many nonprofit organizations, relies on the people comprising it to remain viable. With fewer people come fewer resources. As Schemenauer, Manitou's CEO, stated in her affidavit, removing 60% of Manitou's jurisdiction would result in a commensurate reduction in the number of current child and adult members, prospective members, volunteers, and current and potential donors. Because members' annual participation fees accrue to GSUSA and not to Manitou, fewer participants will not *directly* impact Manitou's bottom line. However, every source of Manitou's revenue is derivative of the number of members active in its council. Cookie sales, from which Manitou nets more than $1 million in profits each year, would be reduced by 60%. With a smaller jurisdiction, there are fewer girls to do the selling and fewer community members to do the buying. Similarly, while the girls themselves are perhaps not soliciting donations, it is the relationships of these girls to interested community members that prompts donors to direct their charitable dollars toward Manitou. Fewer members means fewer relationships, which results in a reduced donor base.

Manitou operates on an annual budget of approximately $2 million. GSUSA argues that smaller membership will allow Manitou to cut this budget and reduce its expenses in accordance with its reduced revenues, resulting in Manitou's continued financial viability. While it is true that a smaller membership will reduce certain variable costs, many of Manitou's largest expenses are fixed, meaning that they will remain unchanged regardless of Manitou's membership level. Manitou's two camps, for

example, Camp Evelyn and Camp Manitou, feature over 360 acres of land, swimming pools, dining halls, and dozens of other buildings. The overhead to operate these two camps will vary little based on the size of Manitou's jurisdiction. Manitou also owns and operates a corporate headquarters building; like the overhead at the camp-grounds, expenses incurred in running the building are not contingent on the size of Manitou's membership. Working inside the headquarters are seventeen full-time staff members. Again, Manitou must pay the salaries and benefits of its employees regardless of how many individuals are currently participating in Girl Scouting within Manitou's jurisdiction.

Faced with drastically reduced revenue streams and fixed expenses, it is clear that taking a large portion of Manitou's jurisdiction would impose severe financial stress on Manitou that could ultimately force Manitou into insolvency. In addition, without ample resources to continue supporting its organizational infrastructure, Manitou may be forced to terminate portions of its pro-fessional staff or relinquish pieces of real property.

Beyond these tangible concerns, Manitou makes clear that removing its jurisdiction also poses a serious risk to the organization's significant goodwill, which we have recognized can constitute irreparable harm. *See, e.g.,* *Meridian Mut. Ins.*, 128 F.3d at 1220; *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994); *Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 53 (7th Cir. 1980). Manitou, like all Girl Scout councils, relies heavily on goodwill to advance its mis-

sion. For fifty-eight years, Manitou has developed relationships within its community that are vital to its continued existence. These relationships manifest themselves in the form of memberships, which we have already discussed; volunteers; and cash and in-kind donations.

In her affidavit, Schemenauer stated that Manitou has recruited and trained tens of thousands of adult volunteers. Under the proposed realignment, many of these volunteers will, without question, begin donating their time to the new council governing their location. Manitou's investment in these people, in both time and money, will be lost, as will their accrued knowledge and work capacity.

Perhaps the most significant area in which Manitou will feel a loss of goodwill is in its pursuit of charitable donations. Manitou has received tens of millions of dollars in donations, in both cash and in-kind gifts, to help Manitou provide experiences for its members. These gifts come from individuals, businesses, foundations, and other charitable organizations. By removing 60% of its jurisdiction, Manitou would undoubtedly lose or damage many of these relationships. Donors now located in the new jurisdiction will be inclined to donate to the local council administering to that jurisdiction, not Manitou. And donors within Manitou's remaining jurisdiction may become disillusioned with Manitou's shrinking territory or, worse still, believe that Manitou has done something wrong that warrants GSUSA's reduction in its jurisdiction. In contrast with *American Hospital Supply*, in which we found similar harm to goodwill speculative, 780 F.2d at 595, here such damages have already become

evident. Schemenauer provided figures in her affidavit demonstrating that donors have already withheld nearly $30,000 in contributions based on mere speculation within the community regarding Manitou's forced merger or loss of territory. The situation promises only to worsen once that speculation becomes reality.

The district court's final merits-based conclusion was that any harm Manitou might suffer before final resolution of its claims would not be irreparable. A harm is "irreparable" if it "cannot be prevented or fully rectified by the final judgment after trial." *Roland Mach.*, 749 F.2d at 386. The district court found not only that Manitou had failed to demonstrate it would be injured absent a preliminary injunction, but also that any alleged injuries were not irreparable, i.e., that any injuries would be rectifiable following a final judgment on the merits by simply restoring the taken jurisdiction to Manitou.

As we have shown, however, simply returning the territory to Manitou following trial will not account for the incalculable losses Manitou risks in the interim—namely, the potential loss of property, employees, or its entire business, as well as damage to its goodwill. These harms are both real and irreparable. *See Pelfresne v. Vill. of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989) ("As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity . . . ."); *Gateway E. Ry.*, 35 F.3d at 1140 (recognizing that although economic losses generally will not sustain a preliminary injunction, there are exceptions where, as here, a remedy may come " 'too

late to save plaintiff's business'" (quoting *Roland Mach.*, 749 F.2d at 386)); *Meridian Mut. Ins.*, 128 F.3d at 1120 ("[T]he plaintiff has suffered injury to its goodwill . . . . Such damage can constitute irreparable harm . . . ."); *cf. Kinney ex rel. NLRB v. Int'l Union of Operating Eng'rs, Local 150*, 994 F.2d 1271, 1279 (7th Cir. 1993) (noting that, from an employee's perspective, termination was an irreparable injury for which money damages were an inadequate remedy).

Given these findings, we are " 'left with the definite and firm conviction that a mistake has been committed.' " *Anderson*, 470 U.S. at 573 (quoting *U.S. Gypsum Co.*, 333 U.S. at 395); *see also Roland Mach.*, 749 F.2d at 390 (questioning "whether the judge exceeded the bounds of permissible choice in the circumstances"). Manitou clearly risks irreparable harm if it is not granted the protection of a preliminary injunction. The district court's finding to the contrary is clearly erroneous, and the court therefore abused its discretion by relying on that erroneous finding as the basis for its decision to deny the preliminary injunction.

### 2. *The District Court's Statutory Conclusions*

As further support for its conclusion that Manitou would not suffer irreparable harm, the district court disagreed with Manitou's argument that it was a "dealer" protected by the Wisconsin Fair Dealership Law, Wis. Stat. § 135.02(2), and, as such, enjoyed a statutory presumption of irreparable harm, *id.* § 135.065. Whether an organiza-

tion qualifies for protection as a dealer under the WFDL is question of law that we review *de novo. Simos v. Embassy Suites, Inc.*, 983 F.2d 1404, 1411 (7th Cir. 1993).

The Wisconsin legislature enacted the WFDL to promote "fair business relations between dealers and grantors, . . . the continuation of dealerships on a fair basis," Wis. Stat. § 135.025(2)(a), and "[t]o protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships," *id.* § 135.025(2)(b). Specifically, the WFDL makes it illegal for any grantor to "terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause." *Id.* § 135.03. A party properly seeking protection under the WFDL enjoys a statutory presumption of irreparable harm. *Id.* § 135.065.

The WFDL protects only a "dealer," defined as an organization that is the grantee of a dealership. *Id.* § 135.02(2). The statute specifies three requirements for a dealership to exist. *See id.* § 135.02(3)(a). First, that there be a contract or agreement between the two parties. *Id.* Second, that the agreement provide the grantee the right to do one of three things: (1) sell goods or services; (2) distribute goods or services; or (3) use the grantor's trademarks, names, logos, or other commercial symbols. *Id.* Third, that there exist a "community of interest" between the parties "in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise." *Id.* Applying the facts to these requirements, we conclude that Manitou is a dealer and therefore falls within the purview of the WFDL.

*a. Agreement Between the Parties*

For a dealership to exist, the first requirement is that there be an agreement between the parties. The form of this agreement is of little concern. *See id.* § 135.02(3)(a) (noting that the agreement can be "either expressed or implied, . . . oral or written"). GSUSA does not contest the presence of an agreement between GSUSA and Manitou. Although the contours of that agreement remain somewhat in dispute, that an agreement exists in one form or another is without question.

*b.   Sale or Distribution of Goods or Services; Use of Protected Marks*

The second requirement for a dealership is that the agreement must grant to Manitou "the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol." *Id.* Although any one of these three functions would suffice to satisfy the requirement, Manitou succeeds on all three grounds.

First, Manitou sells and distributes goods. Manitou's primary revenue stream derives from its annual sale of Girl Scout cookies, which nets Manitou a yearly profit in excess of $1 million. During this process, Manitou's members both solicit sales and distribute the products. *Cf. Moodie v. Sch. Book Fairs, Inc.*, 889 F.2d 739 (7th Cir. 1989) (holding that although a book distributor did not sell goods or use protected marks, its distribution activities qualified it as a dealer under the WFDL); *Bush v. Nat'l Sch.*

*Studios, Inc.*, 407 N.W.2d 883, 888 (Wis. 1987) (noting that a "prepackaged business format dictated by the franchisor and identified with the franchisor's trademark" was "clearly covered by the WFDL"); *Siegel v. Leer, Inc.*, 457 N.W.2d 533, 536 (Wis. Ct. App. 1990) (finding that the sale of "pick-up truck caps" satisfied the "sale of goods" requirement of a dealership).

Second, Manitou distributes services—namely, educational and community services afforded by participation in Girl Scouting. *Cf. Bush*, 407 N.W.2d at 891 (finding this second prong of the dealership test satisfied by a distributor of student photography services); *Bakke Chiropractic Clinic, S.C. v. Physicians Plus Ins. Corp.*, 573 N.W.2d 542, 545-47 (Wis. Ct. App. 1997) (listing factors the court found persuasive in reaching its decision in *Bush*). As GSUSA reiterates throughout its arguments, the mission of Girl Scouting is one of education. Absent Manitou's relationship with GSUSA, it loses the ability to provide Girl Scouting services, a fact that Wisconsin courts have found important in addressing whether "services" are being offered under the WFDL. *See Bakke*, 573 N.W.2d at 546; *Pollack v. Calimag*, 458 N.W.2d 591, 596 (Wis. Ct. App. 1990) (finding it important that a doctor retained the ability to provide health services regardless of whether he was associated with a particular clinic).

Third, Manitou makes exhaustive use of GSUSA's names and marks. These names and marks, which are the essence of Manitou's identity, provide Manitou with its entire reason for being. The Wisconsin Supreme Court has contemplated sufficient use of the mark where "the

trademark of the grantor or of the dealership is . . . prominently displayed for several purposes, including as an implicit guarantee of a certain quality of product and service." *Foerster, Inc. v. Atlas Metal Parts Co.*, 313 N.W.2d 60, 66 (Wis. 1981). Manitou uses GSUSA's marks, logos, and names on virtually everything it produces or sells, including advertisements, newsletters and other publications, uniforms, and merchandise. It is clear that Manitou "has made a substantial investment in the trademark." *Moodie*, 889 F.2d at 743 (finding only *de minimis* investment in the protected marks relevant to that case).

Despite these facts, GSUSA continues to argue that the WFDL is inapplicable. Its grounds for this argument, however, remain murky. It ignores that local Girl Scout councils sell millions of dollars of cookies each year and states that the mission of Girl Scouts is "an educational one," that local councils are not " 'dealers' in anything," and reiterates that the local councils are nonprofit entities.

But we remain guided by the statute. The WFDL expresses no concern for the "mission" or other motivation underlying the sales in question; it asks only whether sales occur. Nor does the statute draw any distinction between "for-profit" and "not-for-profit" entities. Its stated concern is with "fair *business* relations," Wis. Stat. § 135.025(2)(a) (emphasis added), and it is beyond dispute that nonprofit corporations can be substantial businesses. Indeed, both GSUSA and Manitou, notwithstanding their status as nonprofits, are multimillion-dollar businesses possessing substantial assets and liabilities.

GSUSA even conceded at oral argument that the WFDL does not contain a blanket exemption for nonprofit organizations. But, aside from its argument regarding the educational mission, which we find largely irrelevant and wholly unpersuasive, GSUSA is unable to state a reason that *this* nonprofit should be exempt while it admits that others are not.

Finally, GSUSA's argument that the Girl Scouts are not "'dealers' of anything," emphasizing the word "dealer" as if its members are accused of selling drugs on the street corner, is unavailing. It matters not whether we would call the Girl Scouts "dealers" in everyday conversation; what matters is only how the statute defines the term, and the activities of Manitou clearly fall within its definition.

In concluding that Manitou was not a dealer, the district court, quoting the Wisconsin Supreme Court's decision in *Kania v. Airborne Freight Corp.*, 300 N.W.2d 63, 76 (Wis. 1981), said it would not adopt an "expansive interpretation of the definition of 'dealership.'" As we have shown, however, finding that Manitou qualifies as a dealer requires no expansion of the WFDL. Manitou is a business. It sells and distributes goods. It distributes services. It makes extensive use of GSUSA's marks and names. These requirements satisfy the statute's plain language, which the Wisconsin Supreme Court has recognized was designed "to encompass an extraordinarily diverse set of business relationships not limited to the traditional franchise." *Ziegler Co. v. Rexnord, Inc.* (*Ziegler I*), 407 N.W.2d 873, 878 (Wis. 1987) (discussing broader

statutory objectives in the context of the "community of interest" dealership requirement).

### c.  Community of Interest

Having determined that Manitou has satisfied the first two requirements for "dealership" status under the WFDL, we turn to the final inquiry, which is whether there exists the necessary "community of interest" between Manitou and GSUSA. *See* Wis. Stat. § 135.02(3)(a) (requiring "a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise"); *see also id.* § 135.02(1) (defining "community of interest" as "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services").

The Wisconsin Supreme Court has established two "guideposts" to inform our analysis of whether a community of interest exists within a business relationship. *See Ziegler I*, 407 N.W.2d at 878-79; *see also Home Protective Servs., Inc. v. ADT Sec. Servs., Inc.*, 438 F.3d 716, 719 (7th Cir. 2006). The first is a "continuing financial interest" between the parties. *Cent. Corp. v. Research Prods. Corp.*, 681 N.W.2d 178, 187 (Wis. 2004); *Ziegler I*, 407 N.W.2d at 878. The second is the level of "interdependence," or "the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship." *Ziegler I*, 407 N.W.2d at 879. Considered together, these two guideposts indicate

whether the alleged dealer's stake in the business relationship is great enough to threaten its financial health if the grantor exercises its power to terminate. *Cent. Corp.*, 681 N.W.2d at 188.

The Wisconsin Supreme Court has also noted that the community of interest analysis involves "a wide variety of facets" of the business relationship. *Ziegler I*, 407 N.W.2d at 879. It has identified a non-exhaustive list of factors that courts should consider, including (1) the duration of the business relationship; (2) the nature and extent of the parties' contractual arrangement; (3) the proportion of time and revenue the alleged dealer devotes to the alleged grantor's products or services; (4) the percentage of gross profits that the alleged dealer derives from the alleged grantor's products or services; (5) the nature and extent of the alleged grantor's territorial grant to the alleged dealer; (6) the nature and extent of the alleged dealer's uses of the alleged grantor's proprietary marks; (7) the nature and extent of the alleged dealer's investment in facilities, inventory, and goodwill in furtherance of the alleged dealership; (8) the personnel devoted by the alleged dealer to the alleged dealership; (9) the amount spent by the alleged dealer on advertising or promotions for the alleged grantor's products and services; and (10) the nature and extent of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products and services. *Id.* at 879-80; *see also Home Protective Servs.*, 438 F.3d at 719-20.

Given these many considerations, GSUSA and Manitou share a continuing financial interest and the interdepen-

dence necessary to find the requisite "community of interest" for a dealership relationship to exist. Manitou has been a local Girl Scout council since GSUSA first chartered it in 1950. The contractual relationship between the two organizations is extensive. Manitou devotes 100% of its time and resources to providing Girl Scouting to its jurisdiction. Manitou derives virtually 100% of its profits from offering Girl Scouting products and services. GSUSA has granted Manitou a broad territory that includes seven counties and over 7,000 active members. Manitou makes extensive use of GSUSA's proprietary marks. Manitou has substantial investments in real property and goodwill within its community, all of which were made in the name of Girl Scouting. Manitou devotes 100% of its personnel to providing Girl Scouting to its jurisdiction. All of Manitou's advertisements or promotions are intended to build interest and support for Girl Scouting.

Only one of GSUSA's arguments against finding a community of interest bears mentioning—once again, the question of "profits" earned by Manitou. GSUSA continues to speak out of both sides of its mouth regarding the WFDL's applicability to nonprofit organizations. At oral argument, GSUSA conceded that all nonprofits are not exempt from protection by the WFDL; in its brief, however, GSUSA remains focused on the for-profit/not-for-profit distinction, arguing that because Manitou, as a nonprofit, earns no "profits," it cannot be a dealer under the statute. In this regard, however, GSUSA is simply wrong. "For-profit" and "not-for-profit" are shorthand

classifications, not literal labels. A "profit" is an excess of revenues over expenditures. What distinguishes a for-profit from a not-for-profit is what the company does with these excess revenues. GSUSA understands this distinction. Quoting from *Essential Elements of a Girl Scout Corporation*, a GSUSA publication:

> The term "nonprofit organization" does not mean (as is most often incorrectly assumed) an organization that cannot enjoy a profit. Rather, the term means that the organization's profit may not be distributed to its members, officers, or directors in their private capacities. *Profit is defined as excess revenue over expenses*, and commonly known in Girl Scouting as a surplus . . . . *Nonprofit organizations are permitted to generate profits* but cannot pass profits on to persons as equity owners.

Girl Scouts of the U.S. of Am., *Essential Elements of a Girl Scout Corporation* 10 (1999) (emphasis added). Indeed, the record indicates that both GSUSA and Manitou, although "nonprofits," operate at a substantial surplus.

*     *     *     *     *

To summarize this portion of the analysis, Manitou is a "dealer" within the meaning of the term as defined by the WFDL. First, a contractual relationship exists between Manitou and GSUSA. Second, Manitou sells or distributes GSUSA's products or services and makes extensive use of GSUSA's proprietary marks. And third, a community of interest exists between Manitou, the dealer, and GSUSA, the grantor. We next turn to the practical implications that Manitou's dealership status has on its prayer for interlocutory relief.

The WFDL presumes that a dealer has been irreparably harmed when the dealer seeks to preliminarily enjoin a grantor's alleged violations of the statute. Wis. Stat. § 135.065. The statute does not make clear, nor have the Wisconsin courts addressed, whether this statutory presumption of irreparable harm is rebuttable or irrebuttable. *But see S & S Sales Corp. v. Marvin Lumber & Cedar Co.*, 435 F. Supp. 2d 879, 884-86 (E.D. Wis. 2006) (examining the issue before ultimately concluding that the WFDL provides for a rebuttable presumption of irreparable harm). We need not attempt to decide how the Wisconsin Supreme Court would decide that issue today, because even if we are to assume that the presumption is rebuttable, GSUSA has not rebutted it. As we discussed at length above, Manitou will be irreparably harmed by GSUSA's attempts to unilaterally remove a large portion of its jurisdiction, even without the protection of the WFDL. It would be nonsensical for us to make such findings but agree with GSUSA that it has rebutted the WFDL's presumption of irreparable harm.

For the foregoing reasons, we conclude that Manitou would be irreparably harmed between now and resolution of Manitou's claims on the merits if we permitted GSUSA to alter Manitou's jurisdiction during the interim period. Because the record contains ample information to evaluate the remaining factors in the preliminary injunction analysis—indeed, everything that the district court used to make its decision, given that the court declined to hold an evidentiary hearing—we now turn to the question of the adequacy of legal remedies. *See Meridian Mut. Ins.*, 128 F.3d at 1120.

*B. Inadequacy of Legal Remedies*

In addition to irreparable harm, a second threshold requirement that an injured party must meet to obtain interlocutory relief is to demonstrate that traditional legal remedies, i.e., money damages, would be inadequate. *Ty*, 237 F.3d at 895; *Lawson Prods.*, 782 F.2d at 1433; *Roland Mach.*, 749 F.2d at 386. A damages remedy need be "seriously deficient," but not "wholly ineffectual." *Roland Mach.*, 749 F.2d at 386. In *Roland Machinery*, we discussed four general circumstances that could result in an inadequate legal remedy, at least two of which are applicable here.[8] *Id.*

The first is when a damages award may come too late to save the plaintiff's business. *Id.* As we discussed above, there is a substantial risk in this case that Manitou, given a drastically reduced jurisdiction, will lack the cash flow necessary to sustain the fixed costs of operating its business. Additionally, we have recognized that a longstanding business often has a vested interest in continuing in that business, not simply in receiving the monetary equivalent of its operation. *See id.; see also Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205

---

[8] In addition to the two situations discussed above, the other two instances we cited in *Roland Machinery* that could lead to inadequate legal remedies are, first, if the plaintiff's lost revenues would make it impossible to finance its lawsuit, and second, if the plaintiff would be unable to collect damages from the defendant at a later time because of the defendant's subsequent insolvency. 749 F.2d at 386.

(2d Cir. 1970) (noting that a terminated family auto-mobile dealer had a "right to continue a business in which [he] had engaged for twenty years and into which his son had recently entered" that was "not measur-able entirely in monetary terms"). Manitou wants to provide Girl Scouting to the young women living within its jurisdiction in eastern Wisconsin, not trade its opera-tion for a sum of GSUSA's money. *Cf. Semmes Motors, Inc.*, 429 F.2d at 1205 ("[T]he Semmes want to sell automobiles, not to live on the income from a damages award.").

A second circumstance leading to an inadequate legal remedy is when the nature of the loss incurred by the plaintiff makes it difficult to calculate damages. *Roland Mach.*, 749 F.2d at 386. In this situation, Manitou's damages would be virtually impossible to compute. This conclusion is based on the potential loss of institutional knowledge accompanying the unwanted termination of employees, *cf. Local Lodge No. 1266, Int'l Ass'n of Machinists & Aerospace Workers v. Panoramic Corp.*, 668 F.2d 276, 286-87 (7th Cir. 1981) (noting that "[w]here, as here, employer action threatens a permanent loss of jobs, a damage remedy is inadequate" and concluding that reinstate-ment of terminated employees would be, "at best, im-practicable"); loss of real property, *see Pelfresne*, 865 F.2d at 883 ("[L]and is viewed as a unique commodity for which monetary compensation is an inadequate substi-tute."); and damage to goodwill, *Ty*, 237 F.3d at 902 ("'[I]t is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill . . . .'" (quoting *Abbott Labs.*, 971 F.2d at 16)).

For these reasons, it is apparent that only an equitable remedy would provide Manitou with effective relief. Having concluded that Manitou has satisfied two of the three threshold requirements for us to issue a preliminary injunction, we now turn to the third: Manitou's likelihood of success on the merits of its claims.

### C. Likelihood of Success on the Merits

To succeed in its attempt to preliminarily enjoin GSUSA from interfering with its jurisdiction, Manitou must show that it has a "better than negligible" chance of success on the merits of at least one of its claims. *Ty*, 237 F.3d at 897; *Omega Satellite Prods. Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir. 1982). This is an admittedly low requirement and is simply a threshold question. *Roland Mach.*, 749 F.2d at 387. Only after we clear the threshold inquiries and proceed to the balancing phase of the analysis must we determine how likely Manitou's success must be for us to issue the requested injunction. *Id.*; *see also Ty*, 237 F.3d at 895; *Abbott Labs.*, 971 F.2d at 12.

Manitou's complaint contains ten causes of action against GSUSA. Count I alleges violations of the WFDL. The WFDL provides that "[n]o grantor, directly or through any officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause." Wis. Stat. § 135.03. In defense of its actions, GSUSA argues, first, that it is not changing the competitive circumstances of Manitou's agreement with GSUSA, and, alter-

natively, that if GSUSA is doing so, it is with good cause. For the following reasons, we conclude that Manitou has a better-than-negligible chance of succeeding on the merits of its WFDL claim. Because Manitou surpasses the threshold on at least one of its causes of action, we need not discuss Manitou's likelihood of success on its remaining nine claims.

### 1. Substantial Change of the Competitive Circumstances of the Dealership Agreement

GSUSA first contends that stripping Manitou of 60% of its jurisdiction does not alter the competitive circumstances of Manitou's agreement with GSUSA. Section 135.03 prohibits a grantor from substantially changing "the competitive circumstances of a dealership *agreement* without good cause." *Id*. (emphasis added). Citing the Wisconsin Court of Appeals's decision in *Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.*, 431 N.W.2d 721 (Wis. Ct. App. 1988), in which a food wholesaler sought to terminate its agreement with a grocer, GSUSA claims that the terms of its agreement with Manitou preclude finding any change in competitive circumstances. First, GSUSA argues that, like the agreement in *Super Valu Stores*, its agreement with Manitou is nonexclusive. Second, GSUSA contends that because Manitou's charter application provides that its jurisdiction is "subject to change at the discretion of the GSUSA," it acted within the conduct contemplated by the agreement, not as a substantial change to it. We find both arguments unpersuasive

because of ambiguities attending the relevant provisions of the agreement.[9]

It is doubtful that the agreement here is nonexclusive. In *Super Valu Stores*, the court relied heavily on the agreement's express nonexclusivity provision in reaching its conclusions. *Id.* at 725 ("Compliance with the *express terms* of the dealership agreement cannot, *under the circumstances of this case*, give rise to a violation of sec. 135.03." (emphasis added)). In this case, neither the charter nor the application—nor any of the other documents, for that matter—contain such a provision. In fact, language in the charter and application arguably indicates that the parties intended that the agreement *would be* exclusive. In the charter application, for example, Manitou agreed "to develop, manage, and maintain Girl Scouting *throughout the area of its jurisdiction*." Further, the *Blue Book of Basic Documents 2006*, which GSUSA cites at length, contains the following policy statement: "When a

[9] Unlike in *Super Valu Stores*, where there was an express agreement that unequivocally defined the bounds of the questioned relationship, *see* 431 N.W.2d at 723, it is unclear what exactly constitutes the agreement in this case. GSUSA, for example, continues to argue on one hand that there is no formal contract between the parties, while on the other hand claiming that Manitou is bound by the terms of the agreement to adhere to GSUSA's constitution, bylaws, and policies. Having already decided that there is an agreement between the parties, we assume, without deciding, that the contract includes, at a minimum, Manitou's charter and its charter application, which the charter incorporates by its own terms.

Girl Scout council is chartered and the territory in which it is to operate has been decided upon, *all* Girl Scout troops in *all* the communities within that territory shall be under its jurisdiction . . . ." *Blue Book*, *supra*, at 20. Assuming, as only makes sense, that a Girl Scout troop reports to only one local council at a time, and assuming that GSUSA adheres to its own policies, this statement makes it logically impossible that multiple local councils might be assigned the same jurisdiction. GSUSA's long-standing practice of assigning non-overlapping territories to the local councils supports this conclusion. That the agreement did not contain an express nonexclusivity agreement, and was even arguably exclusive, is a signifi-cant difference from the facts in *Super Valu Stores*.

Next, GSUSA encourages us to adopt an expansive interpretation of *Super Valu Stores*, which, according to GSUSA, establishes that *any action* taken by a grantor that is specifically contemplated by the terms of the relevant agreement cannot be a "substantial change in competitive circumstances." *Id.* As we discuss below, ambiguities surrounding the relevant provision in the charter application make it unnecessary for us to decide the scope of the *Super Valu Stores* decision today. How-ever, we note that such an expansive interpretation would conflict with the WFDL's directions to construe its protections liberally, Wis. Stat. § 135.025(1), and to counteract attempts to skirt the WFDL's protections by contractual agreement, *id.* § 135.025(3).

Manitou's charter application contains the following provision:

> [Manitou], now having jurisdiction over the area
> described in the official record of the council's juris-
> diction on file with [GSUSA] . . . , hereby applies for a
> charter for the same jurisdiction, subject to change
> at the discretion of GSUSA, for the term January 1,
> 2006, through December 31, 2009.

The most straightforward interpretation of this provi-
sion, which does not appear in Manitou's charter but
in the application to renew its charter, is that GSUSA
reserved the right to change Manitou's jurisdiction only
during the application process. It says nothing about
GSUSA's ability to alter Manitou's jurisdiction once the
charter has issued. The charter itself further supports
this interpretation. Manitou's actual charter states that
GSUSA grants Manitou the right to administer Girl Scout-
ing "within the area of jurisdiction agreed upon with
[GSUSA]." The only way to read these two statements
together is if one, the application, relates to the time
during the application process, while the other, the
charter, deals with the time after GSUSA issues the charter.

   A second discrepancy between the charter application
and the charter itself provides additional support for this
conclusion. As noted above, the charter application
states that the charter is to run from January 1, 2006, to
December 31, 2009. The charter that GSUSA issued,
however, remains valid not until December 31, 2009, but
for "up to four years." This provides additional evidence
that the above-cited provision pertained only to the
pending application, which was subject to change and not
finalized until GSUSA issued the charter itself. Thus, the

charter, once issued, does not, by its terms, grant GSUSA the right to change Manitou's territory.

Because it is possible to evaluate the present situation and conclude, first, that GSUSA's agreement was exclusive, and, second, that the agreement did not provide GSUSA the right to amend Manitou's jurisdiction, this presents quite a different case from *Super Valu Stores*. There is at least a better-than-negligible chance that GSUSA has substantially altered the competitive circumstances of its agreement with Manitou.

### 2. *Good Cause*

GSUSA's final argument during this phase of the analysis is that if in fact it is attempting to substantially change the competitive circumstances of its dealership agreement with Manitou, it does so with good cause. *See* Wis. Stat. § 135.03 ("No grantor . . . may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership *without good cause*." (emphasis added)). We evaluate the presence of good cause on a case-by-case basis, *Wis. Music Network, Inc. v. Muzak Ltd. P'ship*, 5 F.3d 218, 224 (7th Cir. 1993), with the burden of showing good cause on the grantor, *Morley-Murphy Co. v. Zenith Elecs. Corp.*, 142 F.3d 373, 376 (7th Cir. 1998). The statute defines "good cause" in the following way:

> Failure by a dealer to comply substantially with essential and reasonable requirements imposed upon the dealer by the grantor, or sought to be imposed by the grantor, which requirements are not discrim-

inatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement.

Wis. Stat. § 135.02(4)(a). A dealer also provides good cause if it acts in bad faith "in carrying out the terms of the dealership." *Id.* § 135.02(4)(b).

The Wisconsin Supreme Court liberally addressed the issue of good cause in *Ziegler Co. v. Rexnord, Inc.* (*Ziegler II*), 433 N.W.2d 8 (Wis. 1988). In that case, Rexnord, a manufacturer of industrial equipment, declined to renew its agreement with Ziegler, one of its distributors, prompting Ziegler to sue for alleged violations of the WFDL. *Id.* at 10. In defense, Rexnord argued that although Ziegler had done nothing wrong according to the letter of the statute, Rexnord's substantial economic losses justified its decision. *Id.* at 11. The court concluded that a "grantor's economic circumstances may constitute good cause to alter its method of doing business with its dealers, but such changes must be essential, reasonable and nondiscriminatory." *Id.* Under the court's rationale, for good cause to exist, there must be (1) an "objectively ascertainable" need for the proposed change, (2) the change must be a proportionate response to that need, and (3) the change must be nondiscriminatory. *Id.* at 13; *see also Morley-Murphy*, 142 F.3d at 378.

This court interpreted the *Ziegler II* decision in *Morley-Murphy*, 142 F.3d 373, in which we found that Zenith Electronics might have had good cause for instituting a nationwide change to its distribution system. Zenith's

proposed change was similar in some respects to GSUSA's nationwide restructuring to form large, "high capacity" councils. Zenith, faced with operating losses in nine out of ten years and over $320 million in losses during the previous five years, sought to implement a new nationwide distribution strategy that would result in the termination of Morley-Murphy, a successful Zenith dealer for more than fifty years. *Id.* at 374-75. This court, following the instructions of the Wisconsin Supreme Court in *Ziegler II*, found it possible that Zenith's economic losses justified Morley-Murphy's termination and remanded the case for further proceedings on that issue. *Id.* at 378.

In this case, unlike in *Ziegler II* and *Morley-Murphy*, we question both the objective need and the proportionate response of GSUSA's attempt to unilaterally reduce Manitou's jurisdiction. This is because the circumstances confronting GSUSA differ markedly from those facing Rexnord and Zenith, both of which were reacting to extended periods of substantial economic losses.

GSUSA arguably presents no objective economic need for its proposed action; at the very least, its financial circumstances are a far cry from the dire economic straits confronted by Rexnord, *see Ziegler II*, 433 N.W.2d at 10-11, and Zenith, *see Morley-Murphy*, 142 F.3d at 374-75. GSUSA's financial statements indicate that GSUSA's operating revenues exceeded its operating expenses in Fiscal Years 2005 and 2006, earning operating profits of $886,000 and $2.5 million, respectively. Further, we find little support for GSUSA's argument that intangible concerns such as "fading brand image" and "waning program effectiveness," without a tangible effect on the bottom line,

present the types of concerns Wisconsin courts have contemplated by the "good cause" provision of the WFDL. *See Ziegler II*, 433 N.W.2d at 12 ("If the grantor is demonstrably losing substantial amounts of money under the relationship, it may constitute good cause for changes to the contract.").

Even if the need for change were objectively ascertainable, we also question the proportionality of GSUSA's response. GSUSA is attempting to form fewer councils, each with a larger size. In the present situation, however, if GSUSA succeeds in removing 60% of Manitou's territory, we fail to see how this will help GSUSA advance its strategy. Because Manitou will continue to exist, albeit on a smaller scale, following GSUSA's removal of most of its jurisdiction, the number of councils in Wisconsin will remain the same. In addition, Manitou, as a still-existing council, will be 60% *smaller* than it was before the change. So instead of fewer councils with higher capacity, GSUSA will be left with the same number of local councils, at least one of which will have a reduced capacity. We do not believe that this method of implementing GSUSA's realignment strategy is a proportionate response to its need to address "unfavorable trends" in "membership, brand image and program effectiveness."[10] We therefore

---

[10] We should note that we view with skepticism GSUSA's unilateral removal proposition. If GSUSA succeeds in removing 60% of Manitou's jurisdiction, there is no reason to believe that GSUSA will continue to allow Manitou, by then only 40% of its original size, to continue long-term operations. Doing so

(continued...)

find that chances are better than negligible that a jury could conclude that GSUSA lacked an objectively ascertainable need for its proposed change, or that it failed to respond proportionately to that need.

Based on these findings, we conclude that Manitou has a better-than-negligible chance of success on the merits of its claims. This completes the threshold portion of our analysis. In addition to showing that it has some likelihood of succeeding on the merits of its claims, Manitou has also demonstrated that traditional legal remedies would be inadequate and that it would suffer irreparable harm in the absence of a preliminary injunction. *See Lawson Prods.*, 782 F.2d at 1433. We now proceed to the balancing phase of the preliminary injunction analysis. *Id.*

### D. Balancing Irreparable Harms Using the Sliding Scale

During the balancing phase of the preliminary injunction analysis, the goal of the court is to choose the course of action that minimizes the costs of being mistaken. *Am. Hosp. Supply*, 780 F.2d at 593. To do so, the court must compare the potential irreparable harms faced by both parties to the suit—the irreparable harm risked by the moving party in the absence of a preliminary injunction against the irreparable harm risked by the nonmoving

---

[10] (...continued)

would fly in the face of GSUSA's ongoing initiative: to combine and grow its local councils. Instead, this appears to be only the first step in a multi-step process to remove all of Manitou's territory.

party if the preliminary injunction is granted. *Ty*, 237 F.3d at 895. We evaluate these harms using a sliding scale approach. *Id.* The more likely it is that Manitou will win its case on the merits, the less the balance of harms need weigh in its favor. *Abbott Labs.*, 971 F.2d at 12; *Roland Mach.*, 749 F.2d at 387. Conversely, if it is very unlikely—albeit better than negligible, as we have already determined—that Manitou will win on the merits, the balance of harms need weigh much more in Manitou's favor. *Abbott Labs.*, 971 F.2d at 12; *Roland Mach.*, 749 F.2d at 387. When conducting this balancing, it is also appropriate to take into account any public interest, which includes the ramifications of granting or denying the preliminary injunction on nonparties to the litigation. *Lawson Prods.*, 782 F.2d at 1433; *Ty*, 237 F.3d at 895. This analysis is "'subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" *Ty*, 237 F.3d at 896 (quoting *Abbott Labs.*, 971 F.2d at 12 (citations and internal quotation marks omitted)).

The balance of harms in this case strongly weighs in Manitou's favor. We have discussed at length the irreparable harms that Manitou faces if it is denied injunctive relief. Conversely, GSUSA risks virtually zero irreparable harm. GSUSA is in the midst of a national reorganization that is not scheduled for completion until the end of 2009. With realignment efforts ongoing across the country, a delay in eastern Wisconsin poses little short- or long-term risk for GSUSA. And, in stark contrast to Manitou, any harms GSUSA does face are certainly not irreparable, but are instead fully rectifiable following resolution on

the merits.

The public interest here also favors Manitou. On GSUSA's side are the six councils to which Manitou is supposed to cede its jurisdiction. These councils have already combined, however, and have begun operating as a unified council, so we fail to see how they would suffer significant harm by waiting on this litigation's outcome. Thousands of other people have an interest in this case. It has become an emotional debate for those intimately involved, as well as those watching from the sidelines. In our view, the best way to protect these individuals and families is to offer them finality. The worst thing that could happen to the Manitou community is to have it broken apart, only to try to piece it back together again at a later time. Manitou's members, parents, and community leaders deserve an outcome in this case, regardless of whether it ultimately favors GSUSA or Manitou, that will not later be changed. By maintaining the status quo, we ensure that the final resolution of this case on the merits will be just that—final.

Because the balance of irreparable harms, including the public interest, weighs entirely in Manitou's favor, we need not conduct a lengthy examination to quantify the likelihood of Manitou's success on the merits of its claims. We express no opinion, in fact, on how likely we believe it is that Manitou will succeed on the merits. Given the drastic imbalance of the irreparable harms, we conclude only that Manitou's chances of success, even if they are scarcely greater than "better than negligible," are sufficient to sustain our grant of injunctive relief in this

case. *See Menominee Rubber Co. v. Gould, Inc.*, 657 F.2d 164, 167 (7th Cir. 1981).


## III.  CONCLUSION

For the foregoing reasons, our order of September 11, 2008, REVERSED the decision of the district court and ENJOINED GSUSA "from making any changes to, or interfering with, the current council jurisdiction of appellant Girl Scouts of Manitou Council, Inc., pending final resolution on the merits in the district court."