Joshua FARNAM, Plaintiff,

v.

Roger E. WALKER et al., Defendants.

No. 08–3001.

United States District Court, C.D. Illinois.

Jan. 8, 2009.

Richard J. Gray, Shannon J. Jones, Jenner & Block LLP, Chicago, IL, for Plaintiff.

Ellen C. Bruce, Jacob H. Smith, Office of Illinois Attorney General, Springfield, IL, for Defendant.

***Order Granting Preliminary Injunction***

HAROLD A. BAKER, District Judge.

The plaintiff, incarcerated in Graham Correctional Center, suffers from cystic fibrosis, a progressive, and eventually, fatal disease. The case is now before the court on the plaintiff's motion for preliminary injunction.

An evidentiary hearing on the plaintiff's motion for preliminary injunction was held on December 4, 2008. The plaintiff appeared personally with his appointed pro bono counsel, Richard Gray and Shannon Jones, of Jenner & Block. Defense counsel, Theresa Powell, Esq., and Kelly Choate and Ellen Bruce, Illinois Assistant Attorneys General, also appeared personally. Dr. Rosenbluth (the physician who evaluated the plaintiff) and Defendant Dr. Kayira (the plaintiff's treating physician) appeared by video conference from Concordia in Springfield, Illinois, as did Colleen Gray (Graham's health care unit administrator).

For the reasons below, the court concludes that a preliminary injunction is necessary to prevent irreparable harm to the plaintiff's health pending the final resolution of this case.

### Standard

■ "An equitable, interlocutory form of relief, ' "a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in · except in a case

clearly demanding it." ' " *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America,* 549 F.3d 1079, 1085 (7th Cir.2008)(quoted cites omitted). The plaintiff must, at the threshold, demonstrate that: 1) without a preliminary injunction, he will suffer irreparable harm before the final resolution of his claims; 2) "traditional legal remedies would be inadequate"; and 3) that he "has some likelihood of succeeding on the merits of his claim." *Id.* If the plaintiff makes this threshold showing, the court then balances the potential harms to the parties and, if appropriate, the public interest. *Id.; see also Winter v. Natural Resources Defense Council, Inc.,* — U.S. ——, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008)(plaintiff seeking preliminary injunction must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.").

Fed.R.Civ.P. 65(d) requires an order granting an injunction to state the reasons therefore; the terms specifically; and the acts required or restrained. Fed.R.Civ.P. 65(d)(1). An injunction binds "the following who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation therewith."

18 U.S.C. § 3626(a)(2) of the Prison Litigation Reform Act addresses preliminary injunctions:

(2) Preliminary injunctive relief.—In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be nar-

rowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

Thus, the preliminary injunction in this case will expire 90 days after its entry, unless the court enters a final order for prospective relief before then. However, nothing in § 3626 prohibits the entry of successive orders for preliminary injunction if needed. *See Mayweathers v. Terhune,* 136 F.Supp.2d 1152 (E.D.Cal.2001)(successive preliminary injunctions to maintain status quo are consistent with 18 U.S.C. § 3626(a)(2)).

### Findings of Fact

The court finds these facts for purposes of this order only, based on the evidence presented at the preliminary injunction hearing.

Cystic Fibrosis is a genetic, progressive, multi-organ disease. Lungs suffer chronic infection, excessive mucus secretions, airway obstruction and damage. This is a vicious cycle, the damage to airways causing more secretions, destruction of lung tissue, obstructive lung disease (when one cannot fully exhale), and ultimately, respiratory failure. The liver can also be affected and the pancreas, with the pancreatic ducts becoming

blocked. Pancreatic enzymes often cannot do their job of breaking up proteins and fats. This leads to malabsorption of fats and proteins and significant nutritional deficiencies.

The current median life expectancy for someone with cystic fibrosis is 37 years. However, though cystic fibrosis cannot yet be cured, current treatments do significantly improve symptoms, minimize morbidity, improve survival, prolong life and increase quality of life. Due to new therapies and the standardized care available at Cystic Fibrosis Centers, life expectancy has continually improved over the years, and continues to improve. In the 1950s, the life expectancy was only one to two years. In 1980, the life expectancy was 18 years. The quality of care a cystic fibrosis patient receives correlates directly with length and quality of life.

The plaintiff was diagnosed with cystic fibrosis when he was three months old. He is now 27 years old. Before his incarceration in Graham Correctional Center he was receiving treatment from a Cystic Fibrosis Center in Florida and a Cystic Fibrosis Center in Peoria, Illinois. His most recent visit to a Cystic Fibrosis Center before his incarceration in Graham occurred in November 2002, with Dr. Chatrath at the Cystic Fibrosis Center in Peoria. Dr. Chatrath's treatment prescriptions followed the standard and acceptable protocol for treatment of cystic fibrosis patients.

The plaintiff was incarcerated in Graham Correctional Center in May 2003. His "flutter valve," a device which he must use daily to clear his airways, was confiscated because security determined that the valve's metal bearing could be used as a weapon. No substitute was given. Dr. Chatrath's other treatment recommendations were followed initially. Later, however, Dr. Shah substituted generic enzymes for the plaintiff's brand-name pancreatic enzymes. In 2005, Defendant Dr. Kayira substituted Tobramycin for the plaintiff's "TOBI," an antibiotic specially formulated for delivery to the airways to control chronic infection. Tobramycin is the same antibiotic as TOBI but not in a form specially made for delivery to the airways. Additionally, the plaintiff was not given the fat soluble vitamins needed for his condition, but instead told to buy the vitamins that were available at the commissary. While these substitutions might seem reasonable for a patient who did not have cystic fibrosis, they in fact, arguably, put the plaintiff at substantial risk of serious harm, as will be discussed in more detail below.

The plaintiff tried repeatedly to obtain his flutter valve, or some alternative airway clearance device. He also tried repeatedly to explain that the substitutions that had been made were not substitutions at all, but in fact were causing him, or putting him at risk of, serious harm. He repeatedly explained the importance of the TOBI and also explained the difficulty he was experiencing with the substituted Tobramycin. Eventually he had to stop taking the Tobramycin altogether, as it irritated his lungs and caused him to cough up blood.

The plaintiff filed this lawsuit pro se in January 2008, along with a motion for preliminary injunction (d/e 5) seeking specific treatment for his cystic fibrosis. The court concluded on merit review that the plaintiff stated an Eighth Amendment claim for deliberate indifference to his serious medical needs and solicited assistance of pro bono counsel.

Pro bono counsel appeared for the plaintiff in April 2008 (d/e 59) and discovery ensued on the preliminary injunction mo-

tion.[1] On the plaintiff's motion (d/e 67) and pursuant to the court's order over the defendants' objections (d/e 68), the plaintiff was evaluated by Dr. Daniel Rosenbluth, the Director of the Adult Cystic Fibrosis Center at the Washington University School of Medicine in St. Louis, Missouri.

Dr. Rosenbluth graduated from Mount Sinai School of Medicine in 1989. He completed his residency in internal medicine at Northwestern University Medical School in 1992, followed by a fellowship in pulmonary critical care in the Division of Pulmonary and Critical Care Medicine at Washington University School of Medicine in St. Louis. His subspecialty is cystic fibrosis. Since completing his fellowship, he has been on the faculty at Washington University School of Medicine, in the Pulmonary and Critical Care Division, and is the Director of the Adult Cystic Fibrosis Center. As the Center's Director, he sees about 170 cystic fibrosis patients per year and is responsible for overseeing the other doctors, nurses, social workers and other employees of the Center.

Dr. Rosenbluth evaluated the plaintiff on August 14, 2008. His report, which includes specific recommendations, can be found in several places in the docket, including Exhibit 1 to the plaintiff's closing argument (d/e 102), and tab 2 of the evidence binder submitted by the plaintiff at the preliminary injunction hearing. Dr. Rosenbluth testified at the preliminary injunction hearing by video, and his deposition is also in the record.

The current treatment protocol for cystic fibrosis is set forth at tabs 5 and 6 of the binder of evidence submitted by the plaintiff. This protocol has been compiled by the Cystic Fibrosis Foundation, arrived at by a consensus of CF specialists, and is widely used by cystic fibrosis specialists. The protocol is circulated and must be adhered to by Cystic Fibrosis Centers for continued accreditation. According to Dr. Rosenbluth, this protocol is the routine and standard care for patients with cystic fibrosis. Dr. Rosenbluth's recommendations for the plaintiff are based on these treatment protocols. The primary relevant protocols are set forth below, as are the ways in which the defendants deviated from them.

### 1. Airway Clearance Device to Clear Mucus from the Lungs

Airway clearance devices help clear out the mucus that accumulates in the lungs, which is voluminous and extremely sticky. If the patient does not use an airway clearance device, the mucus secretions are retained, plugging up the airways, worsening the infection and damaging the lungs.

Dr. Rosenbluth usually recommends that patients start with using an airway clearance device at least twice a day, every day. Some patients may need to use it

---

**1.** Attorneys fees for suits brought by incarcerated prisoners are subject to hourly rate caps and other limitations in 42 U.S.C. Section 1997e(d). Section 1997e(d)(2) limits attorneys fees "in cases where prisoners obtain monetary relief to 150% of the damages award." *Pearson v. Welborn,* 471 F.3d 732, 743 (7th Cir.2006). However, if the plaintiff succeeds in securing permanent *injunctive* relief, as opposed to *monetary* relief, the cap would arguably not apply. *See Boivin v. Black,* 225 F.3d 36, 41 n. 4 (1st Cir.2000); *Walker v. Bain,* 257 F.3d 660, 667 n. 2 (6th Cir.2001); *Dannenberg v. Valadez,* 338 F.3d 1070, 1075 (9th Cir.2003); *but see also Sole v. Wyner,* 551 U.S. 74, 127 S.Ct. 2188, 167 L.Ed.2d 1069 (plaintiff was not "prevailing party" for fee purposes where he won preliminary injunction but lost on permanent injunction); *Petersen v. Gibson,* 372 F.3d 862 (7th Cir.2004)(plaintiff who settled was not "prevailing party" because settlement bore no "judicial imprimatur" such as approval of settlement and retention of jurisdiction to enforce).

more frequently, perhaps up to four times a day depending on their situation.

The plaintiff had an airway clearance device on his entry to Graham in May 2003: a "flutter valve." The flutter valve was confiscated because it contained a metal bearing that security determined could be used as a weapon. The plaintiff's family offered to bring his percussion vest, another kind of airway clearance device, but the prison refused. The plaintiff tried repeatedly to obtain some sort of airway clearance device, filing several grievances to no avail. One response to the plaintiff's grievances indicates that alternatives to the flutter valve were being sought, or had been found, but none were provided. At some point a "volumetric exerciser" was substituted, but a volumetric exerciser is not an airway clearance device. A volumetric exerciser, as explained by Dr. Rosenbluth, is like a spirometer, with which a person tries to inflate his lungs. It is not an airway clearance device and, per Dr. Rosenbluth's testimony, provided no benefit to the plaintiff. The plaintiff still had not received an airway clearance device at the time he filed this lawsuit, nearly five years after his incarceration. At some point before the preliminary injunction hearing, the plaintiff apparently received or was to receive the airway clearance device recommended by Dr. Rosenbluth in his report: an "Acapella valve." According to Dr. Rosenbluth, an Acapella valve is an airway clearance device that can be substituted for the flutter valve and which does not contain a metal bearing like the flutter valve.

Certain prescribed medications are also necessary to help break up the mucus, such as Pulmozyme, and broncho-dilators are necessary to open airways and stimulate cilia. It appears the plaintiff has been receiving Pulmozyme and a broncho-dilator for the duration of his incarceration. However, these medicines are in addition to, not replacements for, an airway clearance device.

### 2. Inhaled "TOBI" for Control of Chronic Lung Infection

"TOBI" is a form of the antibiotic Tobramycin, but TOBI is concentrated and specially manufactured for delivery to the airways. TOBI is preservative free, because preservatives can damage airways and irritate lungs. TOBI has been rigorously studied in use with compressors to aerosolize without causing toxicity. TOBI goes locally to the lung, where it can be most effective, minimizing absorption by the body. TOBI is generally prescribed to control chronic lung infection in cystic fibrosis patients. Studies show that TOBI results in fewer infections, better lung function, less hospitalization and less missed work. It is generally prescribed for 28 days, followed by 28 days off.

The plaintiff was receiving TOBI initially at Graham. However, in 2005 Dr. Kayira allowed the pharmacy to substitute an injectable form of Tobramycin for inhalation by the plaintiff. From now on, this injectable, inhaled form of Tobramycin will be called "Tobra" in this order for ease of reference. Tobra is not preservative-free, nor has it been formulated, manufactured or rigorously tested for delivery to the airways. Tobra carries a higher risk of toxicity for cystic fibrosis patients and can also irritate the airways. Tobra carries a higher risk of possible complications including kidney failure, hearing loss, loss of bowel function and loss of vestibular function. TOBI also carries those risks, but to a lesser extent.

Dr. Rosenbluth does prescribe Tobra temporarily for acute infections and exacerbations, such as increased cough, sputum, chest pain, shortness of breath, and a decrease in spirometry. However, he does

not prescribe it for management of chronic lung infection in cystic fibrosis patients because of its toxicity. Tobra was used for some cystic fibrosis patients before TOBI became available in 1997, but since then, Tobra has not been used for chronic infections in cystic fibrosis patients and is not the standard of care in the absence of extenuating circumstances, which are not presented by the plaintiff. Dr. Rosenbluth does have one patient who uses Tobra, but that patient is intolerant of TOBI.

The point was made on cross-exam that TOBI costs $2,400 per month as compared to $500 for Tobra. Dr. Rosenbluth could not confirm this price difference but said he would not be surprised if that were true.[2]

Dr. Kayira called the pharmacy to ask about the substitution and looked no further when the pharmacist told him that TOBI and Tobra were the same, the only difference being cost. Dr. Kayira did not consult with any CF specialist; he relied on the pharmacist. Despite the plaintiff's repeated attempts to educate Dr. Kayira and the prison officials about the differences between TOBI and Tobra, the plaintiff continued to receive Tobra. At some point the plaintiff stopped taking the Tobra because it was irritating his throat and airways and causing him to cough up blood. The plaintiff did not receive TOBI again until years later in 2008, after the plaintiff filed this lawsuit and Dr. Rosenbluth issued his report.[3]

### 3. Brand Name Pancreatic Enzymes for Fat and Protein Absorption

The pancreatic ducts in cystic fibrosis patients become blocked, preventing natural pancreatic enzymes from breaking down fats and proteins. Cystic fibrosis patients must therefore take pancreatic enzymes to help break down fats and proteins, in order to avoid malnutrition.

The accepted treatment for cystic fibrosis patients is to receive brand-name enzymes, not generic enzymes. This is because studies have shown that generic enzymes are not as effective and may actually be harmful to cystic fibrosis patients. Generic enzymes have been linked with malabsorption and distal intestinal obstructions ("DIOS"). The FDA is now requiring all manufacturers of generic enzymes to go through a formal review process because of these problems. Dr. Rosenbluth does not know of any cystic fibrosis specialist who would prescribe generic enzymes in the absence of extenuating circumstances. Dr. Rosenbluth does have one patient who takes generic pancreatic enzymes, but that is because the patient refuses to pay for the brand names, despite Dr. Rosenbluth's persistent attempts to persuade him otherwise.

---

**2.** Expense can be a legitimate factor in treatment decisions. *See Gil v. Reed,* 381 F.3d 649, 662 (7th Cir.2004)("... [I]t is difficult to generalize about the civilized minimum of public concern necessary for the health of prisoners except to observe that this civilized minimum is a function of both objective need and cost."). Here, the less expensive "treatment" was, in Dr. Rosenbluth's uncontroverted opinion, ineffective, potentially harmful, a substantial departure from the standard of care, did not meet the plaintiff's serious medical needs, and was likely to decrease life expectancy if continued. The court draws the inference for purposes of this motion that the substitutions were not medically acceptable alternatives for treating cystic fibrosis.

**3.** Dr. Rosenbluth also testified that the plaintiff was prescribed Amoxycillin at one point for his cough, which, according to Dr. Rosenbluth, was of no benefit to the plaintiff. The plaintiff's sputum culture shows that the plaintiff carries the pseudomonas aeruginosa bacteria, which cannot be effectively treated with Amoxycillin.

Defendant Dr. Shah prescribed generic pancreatic enzymes instead of the brand names, a practice that Dr. Kayira continued. Dr. Rosenbluth concluded in his report that it appeared that the plaintiff "had an unrecognized distal intestinal obstruction secondary to his pancreatic insufficiency and cystic fibrosis" in September of 2006. During this episode, Dr. Kayira observed the plaintiff in the health care unit for days and prescribed Vicodin, but did not refer the plaintiff to a CF specialist or consult a CF specialist. The plaintiff's DIOS eventually resolved on its own, but not without significant pain and suffering, according to the plaintiff. Dr. Rosenbluth believes that the generic enzymes were a possible cause of the plaintiff's DIOS.

### 4. Fat Soluble Vitamins to Prevent Nutritional Deficiencies

Cystic fibrosis patients typically suffer from nutritional deficiencies and need fat-soluble vitamin supplements, particularly for vitamins A, E, D and K, which are not as well absorbed as other vitamins. An over the counter vitamin will not necessarily address the malabsorption challenges faced by a cystic fibrosis patient. If an over the counter vitamin is used, the patient's nutritional status must be monitored closely. The plaintiff sought fat soluble vitamins in prison, but was told that he must buy the vitamins available at the commissary, which are not fat soluble.

### 5. Regular Check–Ups at a Cystic Fibrosis Center to Monitor Condition and Adjust

### Treatment

A Cystic Fibrosis Center is accredited by the Cystic Fibrosis Foundation and must meet specific standards to receive accreditation. These accreditation standards include having on staff a physician who sub-specializes in cystic fibrosis. The Center must follow the accepted treatment protocol developed by cystic fibrosis specialists based on years of research and experience. A patient at the Center is cared for by a team of professionals, including a physician, nurse, social worker and nutritionist. Studies show that patients followed regularly at a Cystic Fibrosis Center do better over the long term with regard to length and quality of life. In fact, those Centers that are most aggressive in their treatment seem to have the best outcomes. Regular check ups are important even if the patient is not experiencing an acute exacerbation, because the CF team can identify and treat lurking problems before they become acute problems. Because of the progressive nature of the disease, the patient's condition is ever-changing, requiring adjustments to medications.

A visit to a CF Center includes lung and pulmonary function tests, tests of sputum cultures,[4] the taking of vitals signs and weight, an examination by a physician sub-specializing in cystic fibrosis, a nutritional status work-up by a nutritionist, reinforcement and teaching by a nurse, and discussions with a social worker to address psycho-social issues. X-rays are taken every 2–3 years and when the patient is experiencing an acute exacerbation.

Dr. Rosenbluth recommended that the plaintiff receive at least annual evaluations at a CF Center, as well as quarterly spirometry and bi-annual sputum testing. He testified that more frequent visits to a CF

---

4. Spirometry is a pulmonary function test which involves blowing into a tube as hard as possible. Spirometry measures the "forced expiratory volume in one second" (FEV 1).

Sputum cultures identify the particular bacteria causing the chronic infection, which is necessary to target treatment.

clinic are optimal, and that many CF specialists would disagree that once a year is even minimally sufficient. Dr. Rosenbluth explained that he was trying to take into account the logistical difficulties and expense of transporting the plaintiff from prison to a CF Center.

Other than his court-ordered visit to Dr. Rosenbluth, the plaintiff has received no visits to a Cystic Fibrosis Center since his incarceration in 2003. Nor did he receive any pulmonary function testing or sputum culture testing. There is evidence that a "J. Miller" at Graham requested approval for the plaintiff be sent to a CF Center in July 2003 and actually made an appointment for the plaintiff at the Cystic Fibrosis Center in Peoria. (7/22/03 referral request form, Graham medical records # 8323; appointment reminder from OSF Medical Center, Graham Medical records # 08315). However, that request was apparently denied per "corporate utilization review" for no stated reason or explanation. (7/22/03 referral request form, Graham medical records # 8323). There was no explanation at the preliminary injunction hearing of who made that decision or why. Besides the refused attempt in July 2003, the court sees no further attempts to send the plaintiff to a CF Center or to even consult a CF specialist.

Dr. Kayira has now apparently agreed to find a CF Center for the plaintiff and have the plaintiff visit twice per year, but there is no indication that the applicable "utilization review committee" will approve that.

## Analysis

### I. Mootness

■ The defendants assert that the plaintiff's motion is moot, since the plaintiff is now receiving everything he requests. They assert there is no ongoing constitutional violation to enjoin. The court disagrees.

First, the plaintiff has not received everything he has requested. Dr. Kayira did testify that the plaintiff is now receiving TOBI; fat soluble vitamins A, D, E & K; and a brand name pancreatic enzyme. However, the plaintiff has not received an evaluation at a Cystic Fibrosis Center or any enforceable commitment that, once he is seen at a Cystic Fibrosis Center, the recommendations of the Cystic Fibrosis center will be followed.[5] Further, the plaintiff is not just seeking particular treatment from a particular doctor at a particular prison. He is seeking that particular treatment for the duration of his incarceration. That is why the IDOC Director and IDOC Medical Director are named in their official capacities, because the relief the plaintiff seeks is systemwide, not just confined to a particular prison or physician or health care contractor. The record in this case supports an inference that the inadequate care the plaintiff received was imposed on him systemically, by different health care contractors, different doctors, and the IDOC. Thus the plaintiff seeks *systemic* relief that will survive transfers to different prisons and changes in contractual providers. He has not received that relief.

5. The plaintiff's visit to Dr. Rosenbluth was a visit to a CF Center, but that was for an evaluation by Dr. Rosenbluth to assess the plaintiff's current treatment and address his immediate needs. The plaintiff was not seen by the CF team and Dr. Rosenbluth's recommendations as to current treatment are intended as a stop gap until the plaintiff is established as a patient at a CF Center. Dr. Rosenbluth's report and testimony make clear the importance of being an established patient at a CF Center because of the continuity of care required.

■ Second, and more importantly, "[v]oluntary cessation of allegedly illegal conduct does not render a case moot unless the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.'" *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 747 (7th Cir.1999) (quoted cites omitted); *see also Lucini Italia Co. v. Grappolini*, 288 F.3d 1035, 1038 (7th Cir.2002)("A request for an injunction, preliminary or otherwise, simply is not mooted because the parties have, for the course of the litigation and by their own agreement, maintained the status quo.")(*citing and quoting See Friends of the Earth v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.")); *Farmer v. Brennan*, 511 U.S. 825, 847 n. 9, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)("even prison officials who had a subjectively culpable state of mind when the lawsuit was filed could prevent issuance of an injunction by proving, during the litigation, that they were no longer unreasonably disregarding an objectively intolerable risk of harm *and that they would not revert to their obduracy upon cessation of the litigation*")(emphasis added); *Jones 'El v. Berge*, 164 F.Supp.2d 1096 (W.D.Wis.,2001)(granting preliminary injunction barring housing of certain mentally ill patients at Supermax and prohibiting transfer of two mentally-ill patients *back to* Supermax).

■ The defendants have not demonstrated that the deliberate indifference to the plaintiff's serious medical needs cannot reasonably be expected to reoccur. They are unwilling to enter into any sort of enforceable agreement, though the IDOC Medical Director and IDOC Director could do so in their official capacities[6], as could Dr. Kayira in his individual capacity to the extent he has authority to direct the plaintiff's care.[7] The defendants are also unwilling to concede that the care the plaintiff did receive was inadequate, maintaining that it is only a difference of professional opinion, not deliberate indifference. Further, the plaintiff did not receive what he has been seeking until the virtual eve of the preliminary injunction hearing, more than five years after his incarceration and months after he filed this case and obtained pro bono counsel and the assistance of Dr. Rosenbluth.

---

6. IDOC counsel did not dispute that the IDOC Medical Director has the authority to direct treatment for a specific inmate and override treatment decisions by the health care contractor. This would seem particularly so here, where two contractors have failed to provide the needed care (Health Professionals and Wexford), that failure has been brought to the Medical Director's attention, and the inmate's life expectancy is at risk. There has been no argument otherwise. Further, Dr. Kayira seemed to agree at the hearing that the IDOC Medical Director could direct him to pursue a specific course of treatment for an inmate. The IDOC defendants argue that the Eleventh Amendment bars injunctive relief against them in their official capacities, *citing Pennhurst*, 465 U.S. 89, 102, 104 S.Ct. 900 (1984). *Pennhurst* involved federal injunctive relief for violations of *state* law, not federal law. The *Pennhurst* Court first acknowledged that federal injunctive relief is available for violations of federal law and then held that the Eleventh Amendment proscribed federal injunctive relief for violations of *state* law. 465 U.S. at 102–106, 104 S.Ct. 900. Prospective relief "requiring a state official to conform his or her behavior to the requirements of federal law in the future" is *not* barred by the Eleventh Amendment. *Hadi v. Horn*, 830 F.2d 779, 783 (7th Cir.1987), *citing Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

7. Wexford Health Sources is not a defendant at present.

Pro bono counsel and Dr. Rosenbluth in turn have expended substantial time and incurred considerable expense in preparation.[8]

The defendants' argument amounts, as the court said at the hearing, to "I will if I want to," which does not render the preliminary injunction request moot. That is not to say that the defendants' current compliance with Dr. Rosenbluth's recommendations is irrelevant. *See Milwaukee Police Ass'n*, 192 F.3d 742, 748 (1999)(cessation of illegal conduct does not render claim moot but may affect availability of injunctive relief because may "impact[ ] ability to show substantial and irreparable harm."). It is simply not enough to persuade the court that there is no "cognizable danger of recurrent violation" or that the risk of irreparable harm has abated.

## II. Irreparable Harm/Adequacy of Legal Remedies

■■ The defendants assert that the plaintiff has not proven that he will suffer irreparable harm without the preliminary injunction. "Irreparable harm means that the plaintiff is unlikely to be made whole by an award of damages or other relief at the end of the trial." *Jones 'El v. Berge*, 164 F.Supp.2d 1096, 1123 (W.D.Wis.2001), *citing Vogel v. American Society of Appraisers*, 744 F.2d 598, 599 (7th Cir.1984).

The plaintiff is at risk of irreparable harm: the shortening of his life. Dr. Rosenbluth's uncontradicted testimony is that the care the plaintiff was receiving at Graham, if continued, would significantly decrease the quality as well as the quantity of the plaintiff's life. The Supreme Court held in *Helling v. McKinney*, 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) that

the Eighth Amendment "protects against future harm" as well as current harm:

We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year. In *Hutto v. Finney*, 437 U.S. 678, 682, 98 S.Ct. 2565, 2569, 57 L.Ed.2d 522 (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed. We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery. Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms.

509 U.S. at 33, 113 S.Ct. 2475. "It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Id.* The plaintiff's evidence allows an inference that the defendants "have, with deliberate indifference, exposed him to ... an unreasonable risk of serious damage to his future health." *Id.* at 35, 113 S.Ct. 2475. The plaintiff's evidence

---

**8.** The plaintiff's counsel represents that Jenner & Block has spent over 300 hours and incurred over $7,000 in expenses to pursue the preliminary injunction. Dr. Rosenbluth testified that he has received no payment for his work. He said at the hearing that he is doing it because it is the correct thing to do.

also allows an inference of current irreparable harm, from the increased symptoms he risks suffering such as increased sputum production, bloody sputum, exertional intolerance, chest pain, and DIOS.

██ Whether the plaintiff has an adequate remedy at law seems substantially the same question as whether he will suffer irreparable injury. The plaintiff must "demonstrate that traditional legal remedies, i.e., money damages, would be inadequate." *Girl Scouts*, 549 F.3d at 1095. Money hardly seems an adequate remedy for a significantly decreased life expectancy or for significant pain and suffering from increased symptoms.

The defendants are correct that the plaintiff's lung functions will decline even if treatment is given. Yet they do not dispute that the plaintiff's lung functions will decline at a *slower rate* with treatment, thus increasing the plaintiff's life expectancy and quality of life. True, it may turn out that it is not possible to put an exact number on the decreased life expectancy, but that does not render the decrease speculative. In fact, the difficulty of putting a number on the harm to the plaintiff's health further supports the court's conclusion that money damages is an inadequate remedy. *Girl Scouts*, 549 F.3d at 1095 ("A second circumstance leading to an inadequate legal remedy is when the nature of the loss incurred by the plaintiff makes it difficult to calculate damages."). The difficulty of calculating damages does not decrease the risk of irreparable harm faced by the plaintiff. The defendants' argument goes to the amount of money damages available, not to the need for injunctive relief.

██ The defendants argue that the plaintiff cannot show he is likely to suffer irreparable harm without a preliminary injunction because they are now giving him everything he asks. The cessation of illegal conduct is relevant in determining whether a substantial risk of irreparable harm is present. *See Milwaukee Police Ass'n*, 192 F.3d at 748 (1999)(cessation of illegal conduct does not render claim moot but may affect availability of injunctive relief because may "impact[ ] ability to show substantial and irreparable harm."). Here, though, the risk of irreparable harm remains present for the same reasons that the preliminary injunction motion is not moot. As discussed below, the plaintiff showed at the hearing that he is likely to succeed on his claim that the defendants were deliberately indifferent to his serious medical needs by denying him an airway clearance device, brand name pancreatic enzymes, fat-soluble vitamins, TOBI, and consultations with a Cystic Fibrosis Center. The plaintiff was only provided with these after appearance of counsel and receipt of Dr. Rosenbluth's report. The plaintiff still has not been established as a patient at a CF Center. The defendants have flatly refused to make an enforceable commitment to continue providing this treatment pending the resolution of this case. Nor is continuation of treatment a reasonable assumption in light of the defendants' past conduct and Dr. Kayira's testimony at the hearing. Even with Dr. Rosenbluth's report, Dr. Kayira still maintains that the plaintiff does not medically need what he has requested. Dr. Kayira testified that, before Dr. Rosenbluth's report, all the plaintiff's serious medical needs were already being met and that the plaintiff was doing well. Dr. Kayira testified that the plaintiff was being given what he requested only to make him happy, not because he had a serious medical need for it. Dr. Kayira appears to still maintain that the plaintiff has no serious medical need unless and until the plaintiff presents with some sort of undefined acute problem. In short, it is clear to the court that the

risk of irreparable harm to the plaintiff remains salient.

## III. Likelihood of Success

■■■■ To show a likelihood of success, the plaintiff, at the threshold, "need only demonstrate a 'better than negligible chance of succeeding.'" *Cooper v. Salazar,* 196 F.3d 809, 813 (7th Cir.1999), *quoting Boucher v. School Bd. of Greenfield,* 134 F.3d 821, 824 (7th Cir.1998). If he meets that threshold showing, then the court "must determine how likely . . . success must be . . . to issue the requested injunction." *Girl Scouts,* 549 F.3d at 1096. The "degree of likelihood of prevailing on the merits that the plaintiff must demonstrate decreases the more heavily the balance of harm weighs in its favor." *Brunswick Corp. v. Jones,* 784 F.2d 271, 275 (7th Cir.1986).

■■■ The plaintiff easily met the threshold showing and also demonstrated that his likelihood of success of obtaining permanent injunctive relief is fairly strong. It cannot be seriously disputed that cystic fibrosis is a serious medical need. Dr. Rosenbluth testified that it is a life-shortening condition, but that with the proper treatment, life expectancy and quality of life are substantially improved. *See Hayes v. Snyder,* 546 F.3d 516, 523 (7th Cir. 2008)("A serious medical condition is one that has been diagnosed by a physician as mandating treatment. . . .").

■■■■ Proving the subjective—deliberate indifference—is more difficult, but the plaintiff presented enough evidence there as well. Deliberate indifference is "know[ing] of and disregard[ing] an excessive risk to inmate health. . . ." *Hayes,* 546 F.3d at 522. "This is not to say that a prisoner must establish that officials intended or desired the harm that transpired. . . . Instead, it is enough to show that the defendants knew of a substantial

risk of harm to the inmate and disregarded the risk." *Id.* It is true that malpractice (negligence) or professional disagreement is not deliberate indifference. *Steele v. Choi,* 82 F.3d 175, 178–79 (7th Cir.1996); *Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir.1996). However, deliberate indifference may be inferred "when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate the person responsible did not base the decision on such a judgment." *Estate of Cole v. Fromm,* 94 F.3d 254, 261–62 (7th Cir.1996); *see also Collignon v. Milwaukee County,* 163 F.3d 982, 989 (7th Cir.1998)(deliberate indifference may be established if "response so inadequate that it demonstrated an absence of professional judgment, that is, that nominally competent professional would not have so responded under the circumstances.").

Dr. Rosenbluth recommended in his report and at the hearing: at least annual evaluations at a Cystic Fibrosis Center; quarterly spirometry evaluation; bi-annual testing of sputum cultures; brand name pancreatic enzymes; fat soluble vitamins; an inhaled nasal steroid; and TOBI inhalation solution administered with the proper nebulizer and compressor. Per Dr. Rosenbluth's uncontroverted testimony, these recommendations are not radical, experimental or "top of the line" treatment. They are simply the routine and standard treatment for cystic fibrosis patients. This routine care was echoed by Dr. Chatrath, the CF specialist whom the plaintiff saw in November 2002 before he was incarcerated at Graham, who made similar recommendations.

Dr. Rosenbluth testified that the treatment the plaintiff was receiving at Graham was a substantial, unacceptable departure from the acceptable range of medical treatment for cystic fibrosis patients.

Specifically, the following actions were a substantial departure: 1) taking away the plaintiff's flutter valve without giving him an effective substitute for airway clearance; 2) substituting generic pancreatic enzymes for brand name enzymes; 3) discontinuing the inhaled TOBI and substituting the injectable Tobramycin; 4) failing to routinely monitor the plaintiff's condition with lung function and sputum culture tests; and 5) failing to send the plaintiff to a Cystic Fibrosis Center and follow the Center's recommendations. There is evidence to support an inference that, at least, the defendants with medical training and the ability to intervene subjectively knew of these needs yet disregarded them in such a way that no "nominally competent professional" would have. The "corporate utilization review" denial of the plaintiff's appointment at the Cystic Fibrosis Center also allows an inference of deliberate indifference. At this point, an inference arises that at least some of the IDOC defendants (such as the Medical Director) participated in and acquiesced to this deliberate indifference.[9]

The defendants offered no evidence to controvert Dr. Rosenbluth's conclusions. The testimony by Dr. Kayira, the plaintiff's current treating physician, only bolstered the plaintiff's case. Dr. Kayira essentially admitted that he did not know there was a significant difference in the pancreatic enzymes and Tobramycin formulations because he is not a CF specialist. He said that the pharmacy made the substitutions and that he relied on a pharmacist's statement that substitutions were just as effective. Dr. Kayira testified that, since he is not a CF specialist, he could not argue with the pharmacist. Dr. Kayira admitted that cystic fibrosis is treated by specialists and that the plaintiff should have been given fat soluble vitamins. Dr. Kayira also testified, however, that he would not send the plaintiff to a CF specialist unless the plaintiff was having some sort of acute problem. Dr. Kayira did not consult with a CF specialist at any time, even when the plaintiff was experiencing significant abdominal pains that Dr. Rosenbluth believes was a classic presentation of DIOS possibly caused by the generic enzymes. Dr. Kayira further testified that he knew the plaintiff had no flutter valve, but that he did not try to find a replacement because the plaintiff had not presented with respiratory problems. Dr. Kayira said he did not "claim to know all the stuff about this" but that the plaintiff never presented with any major problems so he did not feel anything needed to be done. Dr. Kayira testified that he would now follow the CF specialist's recommendations, but only because that is what the plaintiff wanted, not because it is medically indicated. He appears to still believe that the plaintiff is doing well and does not have a serious medical need for the treatment recommended by Dr. Rosenbluth.

The defendants argue that the plaintiff cannot prove he has suffered harm from the alleged inadequate treatment. They point out that the plaintiff's "FEV" (forced expiratory volume) has improved from

9. Defendant Dr. Elyea (the former IDOC Medical Director) was copied on at least one of the plaintiff's grievances. (See June 7, 2004 ARB response, attached to Complaint). At this point, the court cannot rule out the IDOC Medical Director's involvement in the treatment decisions and the denial of the referral request to a CF Center. An inference arises that the IDOC Medical Director has the authority to direct or deny an inmate's specific medical treatment/consultations in certain situations such as this. Other IDOC defendants may have been involved as well and have the authority to intervene. Given the irreparable harm faced by the plaintiff, these inferences are strong enough at this point to warrant preliminary injunctive relief.

2002 (when he was evaluated at a CF Center in Peoria) to 2008. They also offer Dr. Rosenbluth's e-mail attached to his report, in which he stated that "bottom line is that the plan of care is inadequate and can be improved but he [the plaintiff] was doing better than expected, and has not likely suffered any long term harm."

However, Dr. Rosenbluth testified that he believed the plaintiff was experiencing an exacerbation in 2002, meaning that the 2002 FEV number did not represent the plaintiff's best or normal values at that time. He also testified that the progress of the disease cannot be judged solely based on FEV.

As to his e-mail, Dr. Rosenbluth testified that he did not mean the plaintiff had suffered no harm from the inadequate treatment. As Dr. Rosenbluth made clear, the harm suffered was the increased symptoms, including the DIOS. Dr. Rosenbluth's report linked the plaintiff's self-reported increase in cough and sputum production, bloody sputum, and decrease in exertional tolerance, to the lack of an airway clearance device and the lack of TOBI. Dr. Rosenbluth also noted a possible link between the plaintiff's DIOS with the generic enzymes. Dr. Rosenbluth also testified that the plaintiff is likely to suffer from future harm—a decrease in life expectancy—if the inadequate care continues.

In any event, the defendants' argument goes to the amount of damages available, not to the availability of injunctive relief. If it turns out that the plaintiff will not suffer permanent long term damage because of the inadequate care he received to this point that is a very good thing. That, however, would not decrease the likelihood of success on his claim for permanent injunctive relief or erase the risk he faces of irreparable harm. As discussed above, the risk remains salient despite the defendants' voluntary cessation.

## IV. Balancing Harms

 "Courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 129 S.Ct. at 376. The balancing is "an attempt to minimize the cost of potential error...." *Girl Scouts*, 549 F.3d at 1086. This means weighing the potential irreparable harm to the plaintiff without a preliminary injunction against the potential irreparable harm to the defendants if the preliminary injunction issues. *Id.* at 1086–87, 1099–1100 It is a "sliding scale": "'[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Id.* Effects on the public interest (nonparties) are also taken into account where applicable. *Id.*

 The potential harm from erroneously granting a preliminary injunction is slight compared to the potential harm from erroneously denying it. If the plaintiff does not receive the care he needs, he will suffer pain, possible acute exacerbations of his cystic fibrosis, a decreased quality of life and a decreased life expectancy. The defendants do not spell out the harm they will suffer from an erroneously granted preliminary injunction, but presumably it would be the expense and administrative burden of transporting the plaintiff to the CF center and following the Center's recommendations. Apparently, the defendants are already voluntarily taking these steps, which suggests the burden on them is not high. In any event, these hypothesized harms do not outweigh the plaintiff's proven risk of serious harm from improper medical care. Further, the defendants can minimize their harm from an

erroneously granted preliminary injunction at any time by seeking to modify the injunction (if they have evidence that the plaintiff does not need the recommended treatment). They can seek to modify the injunction if conditions change and also have the opportunity to address its continued need every 90 days. The plaintiff, in contrast, has no way to mitigate the harm to his health.

■ As to the interest of non-parties, the court sees no detrimental effect on the public interest by issuing this preliminary injunction, nor do the defendants make the argument. To the contrary, the public has an interest in ensuring that the plaintiff's health is maintained during the pendency of the case, given that the plaintiff has shown a fair likelihood of success. Similarly, the court sees no burden on public safety or the operation of criminal justice system, nor any intrusion on the principles of comity, nor was any such argument made.

## V. Relief

The court believes that the relief granted below is "narrowly drawn, extend[s] no further than necessary to correct the harm the court finds requires preliminary relief, and [is] the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a). One thing that is clear from Dr. Rosenbluth's uncontradicted testimony (at least from a preliminary injunction standpoint) is that cystic fibrosis is a serious and complicated disease requiring treatment coordination by a Cystic Fibrosis Center. Dr. Kayira's testimony confirmed this. Until that occurs, Dr. Rosenbluth's uncontroverted recommendations will be followed. Those recommendations are already narrowly tailored and take into account the prison's concerns of security and administration. For example, Dr. Rosenbluth recommended that the plaintiff

receive a check up at a Cystic Fibrosis Center at least annually. He testified at the hearing that some CF specialists would take issue with that recommendation, believing that at least quarterly checks are necessary. Dr. Rosenbluth explained at the hearing that he was trying to take into account the logistical difficulties that the prison may encounter in transporting the plaintiff to the Center. Dr. Rosenbluth also took into account the prison's security concerns about the plaintiff's flutter valve, recommending an alternative, an Acapella valve, which does not have a metal ball. As another example, Dr. Rosenbluth mentioned that genotyping may be worthwhile to better target new therapies, but he acknowledged that this was not absolutely necessary at present.

The court further narrows the preliminary injunctive relief by not including some of the requests sought by the plaintiff that seem more appropriate for permanent injunctive relief at the close of the case, or perhaps more appropriate for injunctive relief at a later time during the pendency of the case. For example, this order directs one evaluation at a CF Center, but not subsequent evaluations. This order does not direct the defendants to consult with a CF specialist in the event of an acute exacerbation, because at this point the court is unable to define with sufficient specificity what an acute exacerbation might be. The court has included only what appears minimally necessary for the next three months to maintain the plaintiff's health.

**IT IS THEREFORE ORDERED:**

1) The plaintiff's motion for preliminary injunction is granted as follows:

a) By March 1, 2009, Mr. Farnam shall be fully evaluated at a Cystic Fibrosis Care Center accredited by the

Cystic Fibrosis Foundation,[10] which evaluation shall include spirometry and sputum cultures and an examination by a physician board-certified in pulmonology with a subspecialty in cystic fibrosis. Prior to the plaintiff's appointment, said specialist shall be provided with a copy of this order, a copy of Dr. Rosenbluth's report, a copy of the plaintiff's medical records, and a list of all medications currently taken by the plaintiff. The recommendations of said specialist and the other team members of the Cystic Fibrosis Center shall be filed with the Court, with a copy to the plaintiff's attorney. The defendants to whom this injunction issues, and any other defendant or person described in Fed.R.Civ.P. 65(d)(2), shall implement the recommendations made by the Center.

b) Until the plaintiff is evaluated at a Cystic Fibrosis Center and the Center's recommendations are implemented as directed in paragraph 1(a) above, Dr. Rosenbluth's treatment plan for the plaintiff's immediate needs shall be followed. Specifically, the plaintiff shall receive:

1) TOBI inhalation solution (not injectable Tobramycin) at the prescribed levels and intervals, which shall be administered with a DeVilbiss Pulmo Aide compressor or a Pari LC Plus nebulizer;

2) an Acapella valve for the plaintiff to keep in his cell. If allowing the plaintiff to keep the Acapella valve in his cell presents security concerns, the plaintiff shall be allowed access to his Acapella valve no less than four times per day.

3) fat soluble A, D, E and K vitamins in the appropriate dosages.

4) an aqueous based nasal inhaled steroid in the appropriate dosage.

5) brand name pancreatic enzyme supplements in the appropriate dosage(s).

6) Pulmozyme and bronchodilators in the appropriate dosages.

2) This preliminary injunction is entered against and shall be served upon Roger E. Walker, in his official capacity as Director of the Illinois Department of Corrections; Dr. Michael Puisis, in his official capacity as the Medical Director of the Illinois Department of Corrections; Dr. Francis Kayira in his individual capacity, to the extent he is responsible for and/or has the authority to direct the plaintiff's medical treatment; Dr. Shah, in his individual capacity, to the extent he is responsible for and/or has the authority to direct the plaintiff's medical treatment; and any other defendant who is responsible for and/or who has the authority to direct the plaintiff's medical treatment. All the defendants shall take all reasonably necessary steps within their authority to implement this preliminary injunction. As a reminder, this preliminary injunction is also binding on the persons described in Fed.R.Civ.P. 65(d)(2).

3) The IDOC defendants are directed to cause a copy of this preliminary injunction and Dr. Rosenbluth's report to be placed in the plaintiff's master file and in the plaintiff's medical records maintained by the IDOC.

4) The clerk is directed to send a copy of this order to the plaintiff in addition to his counsel.

5) Pursuant to 18 U.S.C. Section 3626(a)(2), this preliminary injunction expires 90 days from the entry of this order. A status conference is scheduled for **April 6, 2009 at 10:00 a.m. by video conference**

---

**10.** The website for the Cystic Fibrosis Foundation lists nine accredited CF Care Centers in Illinois. www.cff.org (last visited December 11, 2008).

to discuss the need for the entry of a successive preliminary injunction. Though the plaintiff is represented by counsel, the clerk is directed to issue a video writ to secure the plaintiff's presence at the status conference.